**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PURDUE UNIVERSITY, *et al.*, | |
| Plaintiffs, | |
| v. | Civ. Action No. 20-3006 (EGS) |
| EUGENE SCALIA, in his official capacity as Secretary, Department of Labor, *et al.*, | |
| Defendants. | |
| STELLAR IT, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civ. Action No. 20-3175 (EGS) |
| EUGENE SCALIA, in his official capacity as Secretary, Department of Labor, *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs in these consolidated cases are a group of academic institutions and companies in the healthcare, immigration, and technology-related sectors that employ foreign nationals throughout the United States. *See* Pls.' Mem. Points Authorities Supp. Mot. Prelim. Inj. APA Section 705 Stay ("*Purdue* Pls.' Mot."), ECF No. 6 at 11, *Purdue Univ. v. Scalia*, No. 20-cv-3006 (EGS) (Oct. 23, 2020); Pls.' Mot. Prelim. Inj. ("*Stellar IT* Pls.' Mot."), ECF No. 7-1 at 34-35, *Stellar IT,*

*Inc. v. Scalia*, No. 20-cv-3175 (EGS) (Nov. 9, 2020).[1] Plaintiffs
challenge a United States Department of Labor ("DOL" or "the
Department") interim final rule entitled "Strengthening Wage
Protections for the Temporary and Permanent Employment of
Certain Aliens in the United States," 85 Fed. Reg. 63,872 (Oct.
8, 2020) ("IFR"). *See Purdue* Pls.' Mot., ECF No. 6 at 11-12;
*Stellar IT* Pls.' Mot., ECF No. 7-1 at 10-11. The IFR updated the
computation of prevailing wage levels set for certain foreign
labor certification programs "to better reflect the actual wages
earned by U.S. workers similarly employed to foreign workers,"
85 Fed. Reg. at 63,872, thereby increasing the prevailing wage
rates for certain occupations "by as much as forty or fifty
percent," *Stellar IT* Pls.' Reply, ECF No. 11 at 1, *Stellar IT,
Inc. v. Scalia*, No. 20-cv-3175 (EGS) (Nov. 16, 2020). Plaintiffs
allege that Defendants violated the Administrative Procedure Act
("APA") in setting the higher wage rates because the DOL did not
provide advance notice and comment prior to promulgating the
IFR. *See Purdue* Pls.' Mot., ECF No. 6 at 11-12; *Stellar IT* Pls.'
Mot., ECF No. 7 at 10-11.

Pending before the Court are the *Purdue* Plaintiffs' motion
for partial summary judgment and *Purdue* Defendants' cross-motion

---

[1] When citing electronic filings throughout this Opinion, the
Court cites to the ECF page number, not the page number of the
filed document.

for partial summary judgment, as well as the *Stellar IT* Plaintiffs' motion for partial summary judgment and *Stellar IT* Defendants' cross-motion for partial summary judgment. Upon consideration of the motions, the responses and replies thereto, the applicable law, the IFR and materials cited therein, and the entire record, the Court **GRANTS** the *Purdue* Plaintiffs' motion for partial summary judgment, ECF No. 6, and the *Stellar IT* Plaintiffs' motion for partial summary judgment, ECF No. 7.

## I. Background

### A. Statutory And Regulatory Background

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, allows for U.S. employers to apply for visas for foreign workers to come to the United States either as nonimmigrants for temporary employment under the H-1B visa classification, or as immigrants to work on a permanent basis. The IFR at issue in this consolidated case "changes the computations used by the Secretary of Labor to establish the prevailing wage for many job opportunities for which employers seek foreign labor certification from" the DOL. *Purdue* Defs.' Opp'n & Mot. Summ. J. ("Defs.' Opp'n"), ECF No. 18 at 9.

### 1. H-1B Visas: Labor Condition Applications

The H-1B visa program permits employers to temporarily employ foreign, nonimmigrant workers in specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H). A specialty occupation is defined

as an occupation that requires "theoretical and practical application of a body of highly specialized knowledge" and "attainment of a bachelor's or higher degree in a specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States." *Id.* § 1184(i)(1).

To participate in the H-1B program, employers must complete a two-step process with respect to each foreign worker they wish to hire. First, employers must submit to the DOL a Labor Condition Application ("LCA") identifying the specialty occupation position at issue and confirming that they will comply with the requirements of the program. *See* 8 U.S.C. § 1182(n)(1); 8 C.F.R. § 214.2(h)(4). In the LCA, the prospective employer must attest, among other things, that it will pay the nonimmigrant worker the greater of "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or "the prevailing wage level for the occupational classification in the area of employment." 8 U.S.C. § 1182(n)(1)(A)(i).

The DOL determines the prevailing wage as of the time of the filing of the LCA. 20 C.F.R. § 655.731(a)(2). However, an employer may not file an LCA more than six months prior to the beginning date of the period of intended employment. 20 C.F.R. § 655.730(b). If there is no applicable collective bargaining agreement "contain[ing] a wage rate applicable to the

4

occupation," an employer may base the prevailing wage on one of the following sources: a current wage as determined under the Davis-Bacon Act or the McNamara-O'Hara Service Contract Act; an independent authoritative source that satisfies the requirements in 20 C.F.R. § 655.731(b)(3)(iii)(B); or another legitimate source of wage data that satisfies the requirements in 20 C.F.R. § 655.731(b)(3)(iii)(C). *Id.* "In the absence of any of these sources, the [DOL's] National Prevailing Wage Center ('NPWC') (a component of the Office of Foreign Labor Certification ('OFLC')) will derive the appropriate prevailing wage from the Bureau of Labor Statistics Occupational Employment Statistics ('OES') Survey." Defs.' Opp'n, ECF No. 18 at 11. An LCA is valid for the period of employment stated in the LCA, but in no event longer than three years. 20 C.F.R. § 655.750(a).

Second, after the DOL certifies the LCA, the employer must then file an H-1B visa petition with the U.S. Department of Homeland Security ("DHS") on behalf of the alien worker, which shows that the proffered position satisfies the statutory and regulatory requirements. 8 U.S.C. § 1184(c); 20 C.F.R. § 655.705(b). An approved H-1B petition allows the foreign national beneficiary to reside in United States and work in the position identified in the petition. There is a statutory limit on the number of H-1B visas (cap and cap-exempt) of 65,000 per year nation-wide, plus an additional 20,000 per year for

Masters, PhD and post-graduate-level graduates of U.S.
universities. 8 U.S.C. § 1184(g)(1)(A), (5)(C).

### 2. Permanent Labor Certifications For EB-2 And EB-3 Visa Workers

The INA also creates a multi-step process for noncitizens
to obtain permanent employment in the United States in certain
professional or skilled occupations. There are five "preference"
categories, or immigrant visa classes, provided in the INA. Two
of the "preference" categories—the second and third categories
(referred to as the EB-2 and EB-3 immigrant visa
classifications)—require a labor certification by the Secretary
of Labor before a prospective employer can apply for a visa with
DHS. *See* 8 U.S.C. §§ 1153(b)(2)-(3), 1182(a)(5)(A). EB-2
immigration work visas apply to foreign workers who are either
professionals holding advanced degrees (master's degree or
above) or foreign equivalents of such degrees, or persons of
"exceptional ability" in the sciences, arts, or business. *Id*. §
1153(b)(2). EB-3 immigration work visas apply to foreign workers
who are either "skilled workers," "professionals," or "other"
unskilled workers, as defined by the statute. *Id*. § 1153(b)(3).

A labor certification reflects the Secretary's
determination that:

> (I) there are not sufficient workers who are able,
> willing, qualified ... and available at the time of
> application for a visa and admission to the United

6

> States and at the place where the alien is to
> perform such skilled or unskilled labor, and
>
> (II) the employment of such alien will not
> adversely affect the wages and working conditions
> of workers in the United States similarly employed.

8 U.S.C. § 1182(a)(5)(A)(i); *see also* 20 C.F.R. § 656.1(a)(1)-(2). To receive certification, the employer must also attest, among other things, that the employer is offering a wage that equals or exceeds the prevailing wage, and that the employer will pay the foreign worker a wage equal to or exceeding the prevailing wage. 20 C.F.R. § 656.10(c)(1). Thus, prior to filing for a labor certification, the employer must obtain a prevailing wage determination for its job opportunity. *Id.* §§ 656.15(b)(1), 656.40(a). If there is no prevailing wage rate derived from an applicable CBA, the employer may elect to use an applicable wage determination under the Davis-Bacon Act or McNamara-O'Hara Service Contract Act, or provide a wage survey that complies with the DOL's standards governing employer-provided wage data. *Id.* § 656.40(b)(2)-(4). In the absence of any of the above sources, the NPWC will use the OES Survey to determine the prevailing wage. *Id.* § 656.40(b)(2).

Once the Secretary certifies the permanent labor certification, the employer may then file a visa petition with DHS on the worker's behalf. *Id.* § 656.17(a). The labor certification must be filed in support of a visa petition within

180 calendar days of the date on which DOL granted the certification. *Id.* § 656.30(b)(1).

### 3. The Prevailing Wage Determination

Since 1998, the DOL has used the OES survey data to calculate prevailing wage rates. *See* Labor Condition Applications and Requirements for Employers Using Nonimmigrants on H-1B Visas in Specialty Occupations and as Fashion Models; Labor Certification Process for Permanent Employment of Aliens in the United States, 65 Fed. Reg. 80110, 80198 (Dec. 20, 2000). In 2004, Congress revised the prevailing wage rate system to require that DOL, when using or making a governmental survey available to employers to determine the prevailing wage, include at least four levels of wages "commensurate with experience, education, and the level of supervision." L-1B and H-1B Visa Reform Act, Public Law No. 108-447, Title IV, Subtitle B, § 423 (Dec. 8, 2004) (8 U.S.C. § 1182(p)(4)). Prior to the issuance of the IFR in this case, DOL determined the four wage rates based on the 17th percentile, the 34th percentile, the 50th percentile, and the 67th percentile, respectively, of the OES reported wage distribution for each occupation. 85 Fed. Reg. at 63,875.

### 4. The Interim Final Rule

On October 8, 2020, the DOL published the IFR at issue, "Strengthening Wage Protections for the Temporary and Permanent

8

Employment of Certain Aliens in the United States," 85 Fed. Reg.
63,872, without providing advance notice and comment. Defs.'
Opp'n, ECF No. 18 at 15.

In issuing the IFR, the DOL asserted that the prevailing
wage levels "are not advancing the purposes of the INA's wage
provisions" because, "under the existing wage levels,
artificially low prevailing wages provide an opportunity for
employers to hire and retain foreign workers at wages well below
what their U.S. counterparts . . . make," which "creat[es] an
incentive—entirely at odds with the statutory scheme—to prefer
foreign workers to U.S. workers, and caus[es] downward pressure
on the wages of the domestic workforce." 85 Fed. Reg. at 63,877.
Based on this view, the IFR incorporates changes to the
computation of wage levels under the DOL's four-tiered wage
structure based on the OES wage survey. 85 Fed. Reg. at 63,872.
The IFR upwardly adjusts the first-tier prevailing wage rate
from the 17th percentile of the OES wage distribution to the
45th percentile; the second-tier prevailing wage rate from the
34th to the 62nd percentile; the third-tier prevailing wage rate
from the 50th to the 78th percentile; and the fourth-tier
prevailing wage rate from the 67th to the 95th percentile. *Id.*
at 63,892-93, 63,905. According to the DOL, "[t]his update will
allow DOL to more effectively ensure that the employment of
immigrant and nonimmigrant workers admitted or otherwise

provided status through the above-referenced programs does not adversely affect the wages and job opportunities of U.S. workers." *Id.* at 63,872.

The IFR took effect the day it was published. *Id.* The DOL explained its decision to forego notice and comment procedures by invoking the "good cause" exception of the APA, *id.* at 63,898, which provides that an agency may dispense with formal notice and comment procedures if the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B). The DOL cited two factors to show the existence of good cause. First, the DOL asserted that "the shock to the labor market caused by the widespread unemployment resulting from the coronavirus public health emergency has created exigent circumstances that threaten immediate harm to the wages and job prospects of U.S. workers." 85 Fed. Reg. at 63,898. Because "flaws in the existing wage levels—which were promulgated through guidance and without meaningful economic justification, are inconsistent with the statute, and serve as the source of adverse labor effects on U.S. workers even under normal economic conditions—can only exacerbate" the "dangers posed to U.S. workers by recent mass lay-offs," the DOL asserted that "[n]otice and comment procedures in these circumstances would make it impracticable for the Department to fulfill its

statutory mandate and carry out the 'due and required execution of [its] agency functions' to protect U.S. workers." *Id.* (second alteration in original). Second, the DOL stated that advance notice and comment would be contrary to the public interest because "[a]dvance notice of the intended changes would create an opportunity, and the incentives to use it, for employers to attempt to evade the adjusted wage requirements." *Id.* The DOL invited interested persons to submit written comments and related material by November 9, 2020. *Id.* at 63,872.

### B. Procedural History

This consolidated case arises out of two lawsuits challenging the lawfulness of the recently issued IFR. Specifically, the lawsuits challenge Defendants' failure to provide advance notice-and-comment rulemaking procedures prior to promulgation. *See Purdue* Mot., ECF No. 6 at 11-12; *Stellar IT* Mot., ECF No. 7-1 at 24-25.

In *Purdue University v. Scalia*, No. 20-cv-3006 (D.D.C. Oct. 19, 2020) (EGS), the *Purdue* Plaintiffs—a group of nine academic institutions and eight "employers operating in the healthcare, immigration, or technology-related fields of endeavor"—filed their lawsuit on October 19, 2020, against Defendants Eugene Scalia ("Mr. Scalia"), in his official capacity as Secretary of the DOL; and the DOL. *See Purdue* Pls.' Mot., ECF No. 6 at 11. On October 23, 2020, the *Purdue* Plaintiffs filed a motion for a

11

preliminary injunction or section 705 APA stay, requesting that
the Court (1) "enjoin[] Defendants from enforcing Department of
Labor Interim Final Regulation: *Strengthening Wage Protections
for the Temporary and Permanent Employment of Certain Aliens in
the United States*, 85 Fed. Reg. 63872 (October 8, 2020)"; and
(2) "requir[e] Defendants, within 10 business days of the date
of the order, to reissue any prevailing wage determinations that
have been issued pursuant to the IFR." *Purdue* Mot., ECF No. 6 at
11. Five days later, the parties in *Purdue* consented to
consolidating the *Purdue* Plaintiffs' motion for a preliminary
injunction with a determination on the merits, pursuant to
Federal Rule of Civil Procedure 65(a)(2), on the claim that the
IFR was improperly issued without advance notice and comment.
*See Purdue* Joint Status Report, ECF No. 12. The Court
accordingly ordered that the motion be consolidated with the
merits and stayed briefing on the remaining arguments in the
motion for preliminary injunction. *See Purdue* Min. Order (Oct.
28, 2020). On November 2, 2020, Defendants filed their
opposition to the *Purdue* Plaintiffs' motion and cross-motion for
partial summary judgment. *See* Defs.' Opp'n, ECF No. 18. The
*Purdue* Plaintiffs filed their reply and response to Defendants'
cross-motion for partial summary judgment on November 9, 2020.
*See Purdue* Pls.' Reply, ECF No. 20.

In *Stellar IT v. Scalia*, No. 20-cv-3175 (D.D.C. Nov. 3, 2020), the Plaintiffs—8 companies that employ H-1B skilled non-immigrant workers throughout the United States—filed their lawsuit on November 3, 2020 against Mr. Scalia, in his official capacity as Secretary of the DOL; and John Pallasch ("Mr. Pallasch"), in his official capacity as Assistant Secretary of the DOL. *See Stellar IT* Compl., ECF No. 1. The *Stellar IT* Plaintiffs then moved for a preliminary injunction on November 9, 2020, requesting that the Court enjoin the DOL's implementation of the IFR. *See Stellar IT* Mot., ECF No. 7 at 1. On November 10, 2020, the parties consented to consolidating the motion for a preliminary injunction with a determination on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2), on the claim that the IFR was improperly issued without advance notice and comment. *See Stellar IT* Joint Status Report, ECF No. 8. The parties also informed the Court that they had conferred with the plaintiffs in *Purdue* and that the parties in the *Purdue* case and in the *Stellar IT* case agreed to consolidate the cases for resolution of the notice-and-comment claim. *Id.* The Court accordingly (1) ordered that the *Stellar IT* Plaintiffs' motion be consolidated with the merits, (2) ordered that the *Stellar IT* and *Purdue* cases be consolidated for resolution of the notice-and-comment claim, and (3) stayed briefing on the remaining

13

arguments in the *Stellar IT* Plaintiffs' motion for preliminary injunction. *See Stellar IT* Min. Order (Nov. 12, 2020).

Following the Court's Orders, and as agreed by the parties in both cases, the Defendants filed a combined reply in support of its cross-motion for partial summary judgment in *Purdue* and response to the *Stellar IT* Plaintiffs' motion for preliminary injunction on November 12, 2020. *See* Defs.' Reply & Opp'n ("Defs.' Reply"), ECF No. 10, *Purdue v. Scalia*, No. 20-cv-3006 (D.D.C. Nov. 12, 2020). On November 16, 2020, the *Stellar IT* Plaintiffs filed their reply brief. *See Stellar IT* Pls.' Reply, ECF No. 11.

The motions are now ripe for adjudication.

## II. Legal Standard

Summary judgment is usually appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31-32 (D.D.C. 2010) (alteration in original) (citing Fed. R. Civ. P. 56(c)), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011). In "a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the Court's role is limited to reviewing the administrative record, so the standard set forth in Rule

14

56(c) does not apply." *Id.* at 32 (citation omitted). In such cases, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 90 (D.D.C. 2009) (citation omitted).

Here, the parties have agreed to waive the filing of the Administrative Record and instead rely upon the IFR and the materials cited therein. *See Purdue* Joint Status Report, ECF No. 12 at 2; *Stellar IT* Joint Status Report, ECF No. 8 at 2. Accordingly, the Court shall review the IFR and the materials cited within the IFR in lieu of the Administrative Record in deciding the parties' motions.

## III. Analysis

Section 553 of the APA generally requires agencies to provide notice of a rule thirty days before it becomes effective and to give the public an opportunity to comment. *See* 5 U.S.C. § 553(b)-(d). These procedures are designed "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d

1250, 1259 (D.C. Cir. 2005). However, notice-and-comment procedures may be waived "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).

Because notice-and-comment procedures are vital to ensuring informed agency decisions, the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has emphasized that the "good cause" exception is to be "narrowly construed and only reluctantly countenanced." *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992)). "The exception is not an 'escape clause'; its use 'should be limited to emergency situations,'" *id.* (quoting *Am. Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)), or "where delay could result in serious harm," *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (citation omitted).

Review of an "agency's legal conclusion of good cause is *de novo*." *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014). Courts must "'examine closely' both the circumstances surrounding [the rule] and the . . . stated rationale for failing to follow notice-and-comment procedures before issuing" the rule. *Council of S. Mountains, Inc. v.*

*Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981). In other words, "the good-cause inquiry is 'meticulous and demanding.'" *Sorenson*, 755 F.3d at 706 (quoting *N.J. Dep't of Envt'l Prot. v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980)). Because notice-and-comment rulemaking is the default, "'the onus is on the [agency] to establish that notice and comment' should not be given," and "[a]ny agency faces an uphill battle to meet that burden." *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 16 (D.D.C. 2017) (first alteration in original) (quoting *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983)); *see also Capital Area Immigrants' Rights Coal. v. Trump*, No. 19-2117 (TJK), 2020 WL 3542481, at *12 (D.D.C. June 30, 2020) ("[T]he D.C. Circuit has set a high bar for satisfying good cause.").

Defendants assert that the good cause exception applies here because advance notice-and-comment procedures would have been impracticable and contrary to the public interest. The Court disagrees for the reasons set forth below.

### A. The DOL Has Not Shown That Providing Advance Notice And Comment Would Be Impracticable

The Court first turns to whether the DOL sufficiently justified its decision, as detailed in the IFR, that advance notice-and-comment procedures would have been "impracticable." 85 Fed. Reg. at 63,898.

"[A] situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in [§ 553]." *Util. Solid Waste Activities Grp.*, 236 F.3d at 754 (second alteration in original) (citation omitted). This inquiry "is inevitably fact- or context-dependent," *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting *Mid-Tex Elec. Coop. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987)); and "[i]n the past, [the D.C. Circuit has] approved an agency's decision to bypass notice and comment where delay would imminently threaten life or physical property," *Sorenson*, 755 F.3d at 706. Courts in this Circuit have found notice-and-comment rulemaking impracticable "only in unusual cases," including when "air travel security agencies would be unable to address threats posing 'a possible imminent hazard to aircraft, persons, and property within the United States'"; when "a safety investigation shows that a new safety rule must be put in place immediately"; or when "a rule was of 'life-saving importance' to mine workers in the event of a mine explosion." *Capital Area Immigrants' Rights Coal.*, 2020 WL 3542481, at *12 (quoting *Mack Trucks, Inc.*, 682 F.3d at 93).

The DOL justified its decision to dispense with notice and comment by asserting that "the shock to the labor market caused by the widespread unemployment resulting from the coronavirus public health emergency has created exigent circumstances that

threaten immediate harm to the wages and job prospects of U.S. workers." 85 Fed. Reg. at 63,898. Although the "INA's wage protections are meant to ensure that the employment of foreign workers does not have an adverse impact on similarly employed U.S. workers," the DOL found that "serious fiscal harm would befall U.S. workers absent immediate action by the Department because the wage and employment risks, already immense, posed to workers by recent mass lay-offs are greatly compounded by the inappropriately low prevailing wage rates." *Id.* The DOL explained that the prior prevailing wage rates allowed employers to pay certain H-1B workers wages that were lower than the market rate for similarly employed U.S. workers, which could lead employers to prefer H-1B workers over U.S. workers and in turn lead to negative outcomes for U.S. workers. *Id.* at 63,899. The DOL concluded that it must take "[i]mmediate corrective action [to correct the wage rates] to ensure that the Department's regulations are, consistent with their purpose, safeguarding the well-being of U.S. workers." *Id.* at 63,900. "Notice and comment procedures in these circumstances would make it impracticable for the Department to fulfill its statutory mandate and carry out the 'due and required execution of [its] agency functions' to protect U.S. workers." *Id.* at 63,898 (alteration in original) (citation omitted).

19

The Court finds that the DOL did not appropriately invoke the good cause exception based upon its stated rationale in the IFR. First, given the DOL's more than six month delay in implementing changes to the prevailing wage calculation, the Court declines to countenance the agency's avoidance of notice-and-comment procedures. Under D.C. Circuit precedent, "[n]otice and comment can only be avoided in truly exceptional emergency situations, which notably, cannot arise as a result of the agency's own delay." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016) (citing *Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920-21 (D.C. Cir. 1983)); *see also Env't Def. Fund, Inc.*, 716 F.2d at 921 ("[T]he good cause exception does not apply when an alleged 'emergency' arises as the result of an agency's own delay . . . ."). Courts in this Circuit have "repeatedly rejected good cause when the agency delays implementing its decision." *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 16; *see, e.g.*, *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 900 F.2d 369, 379 (D.C. Cir. 1990) (holding that "the FAA is foreclosed from relying on the good cause exception by its own delay in promulgating the [challenged] Rules," where "[t]he agency waited almost nine months before taking action" and therefore "could have realized [its] objective short of disregarding its obligations under the APA"), *vacated on other grounds*, 498 U.S. 1077 (1991); *Nat'l*

*Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 622 (D.C. Cir. 1980) (finding agency had failed to demonstrate good cause where it "waited nearly seven months between the initial regulation promulgated through notice and comment and the first modification of it promulgated without the requisite procedures"); *Env't Def. Fund, Inc.*, 716 F.2d at 921 (declining to find that "outside time pressures forced the agency to dispense with APA notice and comment procedures" where agency waited eight months prior to invoking good cause). "Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." *Council of S. Mountains*, 653 F.2d at 581.

While the DOL did not "wait until the eve of a statutory, judicial, or administrative deadline" to act, *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 16, the principles underlying the cases cited above are analogous. Here, the DOL grounds the necessity for its "immediate action" on the "the shock to the labor market" resulting from the COVID-19 outbreak in the United States, 85 Fed. Reg. at 63,898; yet the effects resulting from the pandemic had been ongoing for several months by the time the DOL promulgated the IFR. As outlined within the IFR, the President declared a "national emergency" concerning COVID-19 on

March 13, 2020. *Id.* Because the DOL provided the unemployment statistics the IFR relies upon, by April 2020, the DOL was aware of the "widespread unemployment resulting from the coronavirus public health emergency," which it refers to as "a rate not seen since the Great Depression." *See id.* at 63,898-99 ("Under the high unemployment rates experienced in the U.S. labor market this year, which reached 14.7 percent in April, . . . the existing flawed and arbitrary wage levels pose an immediate threat to the livelihoods of U.S. workers."). Yet the DOL waited until October—when unemployment reached a "critical moment" because it was the month "at which the risk of wage scarring and other adverse employment effects of unemployment [became] especially acute"—to promulgate the IFR without notice and comment. *Id.* at 63,900. Moreover, the DOL's delay in promulgating the IFR is compounded by the fact that the DOL concedes that the update to the prevailing wage levels "should have been undertaken years ago." *Id.*

Defendants argue that to find that the DOL unduly delayed implementing the IFR "would mean that when an emergency upends the country, an agency may forgo advance notice and comment only in the initial stages of that emergency—regardless of how the emergency evolves over time." Defs.' Reply, ECF No. 24 at 12. To justify the delay in acting, Defendants argue that in March 2020, "it was not immediately apparent how quickly the U.S.

22

labor market would recover or what that recovery would look like," but that "[a]s the pandemic continued, . . . it became clear . . . that continued unemployment resulting from the COVID-19 pandemic posed a significant risk to U.S. workers." *Id.* at 12-13. It was thus the pandemic's "continued impact" on U.S. workers that "required the Department to act quickly." *Id.* at 13.

The Court does not discount that the pandemic is and was a "complex and constantly changing crisis." *Id.* Nonetheless, Defendants' arguments fail because the IFR acknowledges that the Executive Branch had early concerns regarding the potentially devastating harms to the U.S. economy as a result of the COVID-19 outbreak, and indeed took actions to mitigate those concerns by April. 85 Fed. Reg. at 63,898. For example, on April 22, 2020, a presidential proclamation suspending the entry of individuals in certain immigrant classifications, such as EB-2 and EB-3, explicitly warned that the "United States faces a potentially protracted economic recovery with persistently high unemployment." *Id.* (quoting Proclamation No. 10014, 85 Fed. Reg. 23,441 (Apr. 22, 2020) ("April 22 Presidential Proclamation")). The proclamation further directed the DOL to "review nonimmigrant programs and recommend other measures appropriate to 'stimulate the United States economy and ensure the prioritization, hiring, and employment of United States

23

workers.'" *Id.* at 63,899 (quoting April 22 Presidential
Proclamation). In addition, a presidential proclamation on June
22, 2020, which restricted the entry of certain immigrants and
nonimmigrants, similarly directed the DOL to consider
promulgating regulations or other appropriate actions "to ensure
that the presence in the United States of aliens who have been
admitted or otherwise provided a benefit . . . pursuant to an
EB-2 or EB-3 immigrant visa or an H-1B nonimmigrant visa does
not disadvantage United States workers." *Id.* (citing
Proclamation No. 10052, 85 Fed. Reg. 38,263 (June 22, 2020)
("June 22 Presidential Proclamation")). Thus, contrary to the
DOL's assertion that it was unaware in March or April of COVID-
19's potential long-term economic impact, the President had
directed the DOL's attention to the threat of "persistently high
unemployment" in the United States as early as April.

Second, even if the DOL's decision to wait until October to
issue the IFR does not constitute undue delay, the DOL still has
not shown that advance notice and comment would have been
impracticable. The DOL simply has not provided record support
establishing that there is imminent "serious fiscal harm" to
U.S. workers in connection with H-1B nonimmigrant visas and EB-2
and EB-3 immigrant visas. *See Capital Area Immigrants' Rights
Coal.*, 2020 WL 3542481, at *13; *see also Sorenson*, 755 F.3d at
706 ("[T]he good-cause exception should be invoked only in

24

'*emergency* situations . . . or where delay could result in serious harm.'" (quoting *Jifry*, 370 F.3d at 1179)).

The IFR provides that "millions of U.S. workers, many of whom work in industries that employ large numbers of H-1B and employment-based immigrants, lost their jobs over the past six months." 85 Fed. Reg. at 63,900. Furthermore, "[u]nder the high unemployment rates experienced in the U.S. labor market this year, which reached 14.7 percent in April, . . . and remain elevated, the existing flawed and arbitrary wage levels pose an immediate threat to the livelihoods of U.S. workers." *Id.* at 63,899. In the DOL's "expert judgment" and "based on its review of the evidence of the effects of the current wage levels, the existing levels are impeding and will continue to impede, to a significant degree, many U.S. workers' ability to return to well-compensated employment" because "the current levels have, in many instances, a suppressive effect on U.S. workers' wages and allow employers to prefer foreign labor as a lower-cost labor alternative." *Id.* at 63,900. Accordingly, the IFR finds that "[w]ithout interventions to help U.S. workers, as many as 8 million individuals laid off earlier this year may reach 27 weeks or more of unemployment starting in October 2020." *Id.*

While it is true that a "full recovery has not occurred," Defs.' Opp'n, ECF No. 18 at 21, the unemployment statistics cited within the IFR did not reflect the economic reality at the

time the DOL issued the rule. Although the DOL acknowledged that "hiring in the U.S. has increased, with continued hiring across all sectors of the economy anticipated," it nonetheless cited to the 14.7 percent unemployment figure from April 2020—despite more recently updated statistics being available—as an indication of the "exigent circumstances that threaten immediate harm to the wages and job prospects of U.S. workers." 85 Fed. Reg. at 63,898-99. Yet, by the time the DOL issued the IFR, the general unemployment rate had dropped to 7.9 percent for September 2020. *See News Release: Statement by Secretary of Labor Scalia on the September Jobs Report*, U.S. Dep't of Labor (Oct. 2, 2020), https://www.dol.gov/newsroom/releases/osec/osec20201002.[2] And according to Mr. Scalia, by September, "[m]ore than half the jobs lost from the pandemic [had] been restored." *Id.*

More significantly, though, the IFR fails to provide any specific findings connecting the high unemployment exacerbated by the pandemic with those occupations typically filled by the immigrant and nonimmigrant workers in the visa programs at issue in this case. The IFR broadly asserts that "many" of the "millions of U.S. workers . . . in industries that employ large

---

[2] The Court takes judicial notice of the press release as it is a government document available from a reliable source. *See Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 68 n.4 (D.D.C. 2019).

numbers of H-1B and employment-based immigrants, lost their jobs over the past six months," and finds that "as many as 8 million individuals laid off earlier this year may reach 27 weeks or more of unemployment starting in October 2020." 85 Fed. Reg. at 63,900. However, because the IFR does not indicate in which sectors the high unemployment rates and lay-offs are located, it is unclear whether the changes the rule implements would in fact alleviate the harms to U.S. workers affected by the "recent mass lay-offs." *Id.* at 63,898.

Similarly, as stated above, the IFR states that the unemployment rate reached a high of 14.7 percent in April 2020. *Id.* at 63,899. But this figure also refers to the overall unemployment figure across all sectors in the United States and, as such, is not the relevant metric for EB-2, EB-3, and H-1B workers. As the IFR identifies, nearly two-thirds of the foreign workers on an H-1B visa work in "computer-related occupations" in the United States. *See id.* at 63,882. And as the U.S. District Court for the Northern District of California recently found in a case analyzing the June 22, 2020 Presidential Proclamation, "[t]he statistics regarding pandemic-related unemployment actually indicate that unemployment is concentrated in service occupations and that large number of job vacancies remain in the area most affected by the ban, computer operations which require high-skilled workers." *Nat'l Ass'n of Mfrs. v.*

*U.S. Dep't of Homeland Sec.*, No. 20-cv-4887-JSW, 2020 WL
5847503, at *13 (N.D. Cal. Oct. 1, 2020) (finding that the
plaintiffs were likely to succeed on their claim because the
proclamation "does not comport with actual facts," among other
things); *see also Purdue* Pls.' Reply, ECF No. 20 at 13 ("During
the 30 days ending October 2, 2020, there were over 655,000
active job vacancy postings advertised online for jobs in common
computer occupations—including over 280,000 postings for
'software developers, applications.'"). Indeed, "[t]he
unemployment rate in computer occupations was 3.0% in January
2020 (before the economic impacts of the virus were felt) and
[stood] at 3.5% in September 2020." *Purdue* Pls.' Reply, ECF No.
20 at 12 (second alteration in original) (citing Amicus Br., ECF
No. 16-1 at 11). "These jobs are simply not fungible." *Nat'l
Ass'n of Mfrs.*, 2020 WL 5847503, at *13. Here, there is a
"significant mismatch of facts regarding the unemployment caused
by the proliferation of the pandemic" and the immigrant and
nonimmigrant worker visas targeted in the IFR. *Id.*

Accordingly, the DOL has failed to demonstrate that it was
necessary to dispense with advance notice and comment in order
to "prevent fiscal harm" to U.S. workers due to recent pandemic-
related "mass lay-offs." *See* 85 Fed. Reg. at 63,898. The Court
therefore finds that the DOL has failed to carry its burden to

show that it was "impracticable" to provide advance notice and comment.

## B. The DOL Has Not Shown That Providing Advance Notice And Comment Would Be Contrary To The Public Interest

The Court next considers whether the DOL sufficiently justified its decision, as described in the IFR, that advance notice-and-comment procedures would have been contrary to the public interest.

"The public interest prong of the good cause exception is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks, Inc.*, 682 F.3d at 95. It is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, "announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent." *Util. Solid Waste Activities Grp.*, 236 F.3d at 755. In such a situation, "notice and comment could be dispensed with 'in order to prevent the amended rule from being evaded.'" *Mack Trucks, Inc.*, 682 F.3d at 95 (citation omitted). "The question is not whether *dispensing* with notice and comment would be contrary to the public interest, but whether *providing* notice and comment would be contrary to the public interest." *Id.*

The DOL justified its decision to dispense with notice and comment by explaining that its actions were necessary "to prevent the evasion by employers of the new wage requirements that would likely result from announcing a change to the levels in advance of the change taking effect." 85 Fed. Reg. at 63,901. According to the DOL, "[t]he limited discretion" it enjoys "with respect to how quickly it reviews LCAs, in combination with the leeway employers have on when they file, as well as historical filing patterns, show that advance notice of the wage level changes effected by this rule could result in the kind of 'massive rush' to evade price changes." *Id.* In addition to noting the "potential administrative burden" the DOL would face in the event of a substantial increase in LCA filings during any advance notice and comment, the DOL asserted that "[a]llowing employers to lock in for extended periods prevailing wage rates that the Department has determined often result in adverse effects on U.S. workers' wages and job opportunities would prolong the very problem—made exigent by the current state of the labor market—that the Department is seeking to address" through the IFR. *Id.*

The Court finds the DOL's explanation insufficient. As an initial matter, although the DOL claims that "announcing a change to the [prevailing wage] levels in advance of the change taking effect" would have caused harm to the public interest,

the Executive Branch had already announced its intent to issue
such a rule some months prior to the IFR's promulgation. For
example, on June 22, 2020, during a background press call with a
"senior administration official," the official announced that
the DOL had "been instructed by the President to change the
prevailing wage calculation . . . with respect to H-1B wages"
and that it was going to "set[] the prevailing wage floor at the
*50th percentile* so [H-1B workers] will be in the upper end of
earnings." *See* Office of the Press Secretary, *Transcript of
White House Background Press Call Concerning the June 22
Presidential Proclamation* (June 22, 2020) (emphasis added),
www.aila.org/infonet/transcript-of-white-house-background-press-
call.[3] In addition, on August 3, 2020, the President publicly
remarked that "[a]s we speak, we're finalizing [H-1B]
regulations so that no American worker is replaced ever again.
[H-1Bs] should be used for top, highly paid talent to create
American jobs, not as inexpensive labor program to destroy
American jobs." *Remarks by President Trump in a Meeting with
U.S. Tech Workers and Signing of an Executive Order on Hiring
American*, White House (Aug. 3, 2020),
www.whitehouse.gov/briefings-statements/remarks-president-trump-

---

[3] The Court takes judicial notice of the White House official's
remarks as representations of the government's position. *See Al-
Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 68 (D.D.C. 2014).

meeting-u-s-tech-workers-signing-executive-order-hiring-american/.[4] Thus, it was public knowledge at least by June that the DOL was working on drafting a rule that would increase the prevailing wage floor with respect to H-1B workers, with the goal of ensuring that they would be "highly paid." The Executive Branch's willingness to reveal its plans to raise the prevailing wage floor, including an estimated percentile change, and deliver status updates on the DOL's development of the IFR undercuts its prediction that "announcing a change" to the prevailing wage calculus would have caused serious harm to the public interest.

In addition, the Court notes that the LCA process has built-in legal safeguards that limit the extent to which employers could take advantage of advance notice-and-comment procedures to evade the rule. While the DOL is required to approve an LCA within seven days of when the application is filed, 20 C.F.R. § 655.740(a)(1), employers themselves are not permitted to file an LCA earlier than six months prior to the beginning date of the period of intended employment, 20 C.F.R. § 655.730(b). Defendants, however, argue that the "limited discretion the Department has with respect to how quickly it

---

[4] The Court takes judicial notice of the President's remarks as representations of the government's position. *See Al-Aulaqi*, 35 F. Supp. 3d at 68.

reviews LCAs, in combination with the leeway employers have on when they file," 85 Fed. Reg. at 63,901, provides the opportunity "for employers to attempt to evade the adjusted wage requirements," *id.* at 63,898. Defendants argue that "employers would have every incentive to submit LCAs during the notice and comment period for the IFR for any *potential* employment of foreign workers within the next six months or even to move up their hiring timelines in order to avoid a requirement to pay a higher wage for years." Defs.' Opp'n, ECF No. 18 at 30. But Defendants ignore the fact that an employer may only file an LCA, which is signed under penalty of perjury, 20 C.F.R. § 655.730(c)(1), if they intend to employ an H-1B worker in an identified occupation, at a specific place of employment, and for a specific period of time, *see id.* § 655.730(c)(4). Indeed, as the *Stellar IT* Plaintiffs point out, the government has previously criminally prosecuted employers "for filing applications for non-existent jobs in temporary worker programs." *Stellar IT* Pls.' Reply, ECF No. 11 at 10 (citing *United States v. Eury*, Nos. 14-cr-39-2/5, 2015 U.S. Dist. LEXIS 1861807, *3 (M.D.N.C. Apr. 23, 2015)).

In any event, the DOL has failed to provide any evidence in the record supporting its prediction that there would be a "massive rush" to evade the IFR if the DOL had provided advance notice and comment. 85 Fed. Reg. at 63,901. This Court

recognizes that the DOL's prediction regarding rule evasion "entails a degree of speculation by the agency," and is therefore "hesitant to discount such forecasts, as they 'necessarily involve deductions based on expert knowledge of the Agency.'" *Tenn. Gas Pipeline Co.*, 969 F.2d at 1145 (quoting *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983)). In addition, "[c]ommon sense dictates that the announcement of a proposed rule may, at least to some extent and in some circumstances, encourage those affected by it to act before it is finalized." *See Capital Area Immigrants' Rights Coal.*, 2020 WL 3542481, at *13. However, under D.C. Circuit precedent, suggesting "incentives" as a justification, without further evidence, is generally insufficient to constitute good cause. *See Sorenson*, 755 F.3d at 707 ("Though no particular catechism is necessary to establish good cause, something more than an unsupported assertion is required."); *see also Tenn. Gas Pipeline Co.*, 969 F.2d at 1146 (finding that where an agency "claim[s] good cause without offering any evidence, beyond its asserted expertise, as to why the public interest is served by the immediate implementation of the interim rule," the agency has failed to demonstrate good cause); *Sorenson*, 755 F.3d at 706 ("To accord deference [to an agency's invocation of good cause] would be to run afoul of congressional intent."); *Capital Area Immigrants' Rights Coal.*, 2020 WL

3542481, at *13 (explaining that good cause justification regarding potential rule evasion "cannot satisfy the D.C. Circuit's standard . . . unless it is adequately supported by evidence in the administrative record suggesting that this dynamic might have led to the consequences predicted by the Departments—consequences so dire as to warrant dispensing with notice and comment procedures."); *see also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1278 (9th Cir. 2020) ("The lag period before any regulation, statute, or proposed piece of legislation allows parties to change their behavior in response. If we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception.").

The D.C. Circuit's decision in *Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141 (D.C. Cir. 1992), is instructive. In *Tennessee Gas Pipeline*, the D.C. Circuit evaluated an agency's invocation of good cause based on the agency's prediction of rule evasion. At issue was a rule that required "advance notice and disclosure by natural gas pipeline companies of the construction of new facilities or the replacement of existing ones." *Id.* at 1142. The agency, the Federal Energy Regulatory Commission ("FERC"), dispensed with notice-and-comment procedures, arguing that such procedures could contribute to

35

environmental harm because the companies "may respond to the proposed changes in the regulations by commencing construction" to avoid regulatory uncertainty or the rule's application to a certain project. *Id.* at 1143. Even though the D.C. Circuit was "hesitant to discount such forecasts" because they "necessarily involve deductions based on expert knowledge of the Agency," the court rejected FERC's argument because it had "provided little factual basis for its belief that pipelines [would] seek to avoid [the] future rule by rushing new construction and replacements with attendant damage to the environment." *Id.* at 1145. The D.C. Circuit noted that the agency had only cited one case where relevant construction had previously harmed the environment, and it found that the agency's claim that it had "ample practical experience on which to support" its prediction did not "excuse the Commission's failure to cite such examples in support of its claim of a good cause exception." *Id.* at 1145-46. The court accordingly held that the agency had failed to demonstrate sufficient cause for setting aside notice and comment procedures. *Id.* at 1146.

Here, too, the DOL has failed to provide any evidence in the record that supports its contention that a "massive rush" to evade the IFR would have occurred if the DOL had provided advance notice and comment. 85 Fed. Reg. at 63,901. Despite pointing to "historical filing patterns" as evidence supporting

its conclusion, the statistics the DOL provides only indicate the average number of LCAs it typically receives during the six month period beginning in September. 85 Fed. Reg. at 63,901 (stating that the DOL receives an average of 147,123 LCAs during this time period over the previous three years). While the Court does not doubt that this number is substantial, it is hardly evidence establishing the likelihood of rule evasion. Neither does the DOL provide evidence that employers have made a "'massive rush' to evade price changes" in the past. For example, as the *Stellar IT* Plaintiffs note, there is no indication that employers have rushed to submit LCAs each June before the yearly publication of new wage rates for the year in July. *Stellar IT* Pls.' Mot., ECF No. 7-1 at 32. And even assuming as true that "the lack of a spike each June is not significant, because the yearly changes to the existing wage rates are not nearly as dramatic as the changes to the computational methodology set forth in the IFR," Defs.' Reply, ECF No. 24 at 15, neither does the DOL provide any evidence of a spike during the approximately four-month period between the Executive Branch's June announcement regarding the planned change to the prevailing wage calculation and the IFR's promulgation in October.

It is true, however, that the D.C. Circuit has recognized that some courts "have allowed use of the good cause exception

based on bare predictions of regulatory avoidance." *Tenn. Gas Pipeline Co.*, 969 F.2d at 1146. For example, Defendants rely on *Mobil Oil Corp. v. Department of Energy*, 728 F.2d 1477 (Temp. Emer. Ct. App. 1983), in arguing that the DOL was not required to offer "hard evidence" that rule evasion would occur. Defs.' Reply, ECF No. 24 at 17-18. *Mobil Oil* involved a Federal Energy Administration ("FEA") regulation, issued without notice and comment, that "equalize[d] prices charged to different classes of customers by oil refiners during the energy crisis of the early [1970s]." *Tenn. Gas Pipeline Co.*, 969 F.2d at 1146. The agency claimed that "advance notice of the regulation would lead to regulatory avoidance by way of long-term contracts," *id.*, and the Temporary Emergency Court of Appeals agreed, despite "no showing that in fact [companies] would be injured during the notice and comment period," *Mobil Oil Corp.*, 728 F.2d at 1492. The D.C. Circuit, however has since distinguished *Mobil Oil*, emphasizing that the court's ruling was based on "special circumstances" that are not present here. *See Tenn. Gas Pipeline Co.*, 969 F.2d at 1146. The D.C. Circuit explained that the facts of *Mobil Oil* "set it apart" because "[i]t is well recognized that prices can be changed rapidly to accommodate shifts in regulatory policy." *Id.* In contrast to the speed of commodity price changes, the Court is not convinced that the filing of LCA applications could increase so rapidly during a notice-and-

comment period such that it would produce significant harms to the public interest—particularly in view of employers' inability to file an LCA earlier than six months prior to employment, as well as the DOL's failure to connect pandemic-related unemployment with the types of occupations typically filled by H-1B workers. The line of similar cases arising from the 1970s energy crisis cited within the IFR are similarly distinguishable. *See, e.g.*, *Nader v. Sawhill*, 514 F.2d 1064, 1068-69 (Temp. Emer. Ct. App. 1975) (finding good cause existed, though agency had failed to provide more than a cursory justification for that finding, and "stress[ing] categorically that our resolution of the procedural issues herein is founded upon the unique circumstances in which this price increase was formulated. Assuming less calamitous circumstances, we fully expect that any future decisions will take the utmost advantage of full and open public comment."); *DeRieux v. Five Smiths*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) (concluding there was good cause "based upon facts so obvious that they may be judicially noticed" where it was "apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline").

The Court therefore finds that the DOL did not sufficiently justify its prediction that advance notice-and-comment procedures would have been contrary to the public interest.

**IV. Conclusion**

For the reasons stated above, the *Purdue* Plaintiffs' motion for partial summary judgment, ECF No. 6, and the *Stellar IT* Plaintiffs' motion for partial summary judgment, ECF No. 7, are **GRANTED**. The *Purdue* Defendants' cross-motion for partial summary judgment, ECF No. 19, and the *Stellar IT* Defendants' cross-motion for partial summary judgment, ECF No. 9, are **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**December 14, 2020**